UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

MALLA L. PULLIAM, III PLAINTIFF

V. CIVIL ACTION NO. 1:25-CV-10-GHD-DAS

DENMAR SERVICES, INC.; et al. DEFENDANTS

**MEMORANDUM OPINION**

Presently before the Court are Defendant DenMar Services, Inc.'s Motion for Summary Judgment [55] and Defendant IUE-CWA Local 83370's ("the Union") Motion for Summary Judgment [57]. Through their instant Motions [55, 57], Defendants seek to dismiss all claims brought against them by Plaintiff Malla L. Pulliam, III. After review, the Court finds both Motions [55, 57] should be granted.

## *I. Factual Background*

This lawsuit arises from Pulliam's termination from his employment with DenMar.

DenMar is a management company that was subcontracted to oversee the management of tools and parts utilized by aircraft mechanics at the Columbus Air Force Base.[1] The Union, of which Pulliam was a member, represents DenMar employees pursuant to a Collective Bargaining Agreement ("CBA").

In October 2019, Pulliam, a black man, began working for DenMar as a tools and parts attendant in hangar T-38 of the base. As part of his duties, Pulliam was required to maintain an inventory of tools and parts to ensure that all equipment was accounted for both prior to and after aircraft maintenance. Those inventories were recorded in a government-operated system called

[1] The prime contractor at the base is M1 Support Services ("M1"), which is not a party to this lawsuit. Employees of M1 supervised DenMar employees in different areas of the base.

TCMAX, and DenMar employees each had their own sign-in credentials (comprised of a username and password) for logging into TCMAX. Regarding equipment inventories, DenMar's operating procedure required tools and parts attendants to perform and record an inventory at the beginning and end of every shift to be completed by two different attendants.

On January 4, 2024, Pulliam's supervisor, Marinda Deans, became aware of a discrepancy in the TCMAX inventory records for January 3, 2024. Specifically, she noticed that Tondela Porter (also known as Tondela Morgan), a black woman who was also a tools and parts attendant, was documented to have conducted an end-of-shift inventory at a time she and Deans were located in a different area of the base. The TCMAX report identified Pulliam as having performed shift-change operations with Porter. On the same date, Porter submitted a signed statement to DenMar indicating that she was not physically present at the T-38 hangar at the time her credentials were used to document the inventory and that she had not authorized anyone to use her credentials. After investigating the discrepancy, Deans learned that Pulliam had used Porter's credentials to record the shift-change inventory as if Porter had participated.[2]

On January 9, 2024, DenMar interviewed Pulliam to further investigate the matter. Present at the meeting were Darren Womack, DenMar's Vice President of Operations; Deans, who, again, was Pulliam's supervisor and a M1 employee; and Marcel Tucker, Union Steward. When asked whether he had used Porter's TCMAX credentials to record a shift-change inventory on January 4, 2024, Pulliam denied it. During his deposition, Pulliam admitted that he had not been truthful to DenMar's management because he had in fact used Porter's credentials on the date in question.

[2] A similar discrepancy appeared in the inventory records for January 2, 2024. However, on that occasion, DenMar learned that Porter had used Pulliam's credentials to document a shift-change inventory without Pulliam's presence.

According to Pulliam, it was a widespread practice for tools and parts attendants to use other employees' TCMAX credentials to conduct shift-change inventories. He testified during his deposition that a list of M1 managers' credentials was located beneath the keyboard at each computer station for his and other DenMar's employees' use. He did admit, however, that Porter's credentials were not on that list. When asked whether DenMar's management was aware of any such practice, he testified that he had no knowledge. He also could not say whether DenMar had approved of any such practice and conceded that no one instructed him to use Porter's credentials.

Ultimately, DenMar terminated Pulliam on January 10, 2024, and replaced him by hiring Teayon McShan, who is also a black man. Following Pulliam's termination, the Union submitted a grievance to DenMar on his behalf. The Union requested for DenMar to reinstate Pulliam (and Porter who was also terminated for the same reason), but DenMar refused to do so. After providing notice of its intent to arbitrate Pulliam's grievance to DenMar, the Union did not move forward with pursuing arbitration upon advice of its legal counsel. Pulliam then filed a charge of race discrimination against DenMar and the Union with the EEOC. This lawsuit followed his receipt of a right-to-sue letter.

## *II. Standard of Review*

Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine dispute of material fact. *Id.* at 323. Under Rule 56(a), the burden then shifts to the nonmovant to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). When the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal citations omitted). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, 490 F. App'x 666, 667 (5th Cir. 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

### ***III. Analysis and Discussion***

Pulliam brings claims of race discrimination pursuant to Title VII of the Civil Rights Act and 42 U.S.C. § 1981 against both DenMar and the Union, a claim for breach of the CBA against DenMar, and a fair representation claim against the Union. Before turning to the merits of the claims, the Court will briefly address a preliminary issue raised by Pulliam in his Response Memoranda [64, 65].

As a threshold issue, Pulliam asks this Court to defer ruling on DenMar and the Union's Motions [55, 57] because he "has been structurally denied the procedural opportunity to cross-

examine core witnesses under oath or review withheld documents." [65] at p. 1. Stated differently, he argues that he has not had a fair opportunity to conduct discovery and therefore cannot adequately support his opposition to the Motions [55, 57].

In a prior ruling, this Court denied Pulliam's request for an extension of the discovery deadline finding that he "simply failed to diligently engage in and pursue discovery in this matter" despite the fact that the Court had extended the deadline twice. [53] at p. 2. Pulliam now attempts to relitigate that issue by relying on Federal Rule of Civil Procedure 56(d).

Notably, the Fifth Circuit has held that "[i]f the requesting party has not diligently pursued discovery… [he] is not entitled to relief under Rule 56(d)." *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 700 (5th Cir. 2014) (internal quotation marks and citations omitted). Though he now contends that Defendants have engaged in some form of gamesmanship, the Court notes that Pulliam did not seek to compel discovery based on those allegations during the discovery period or at any point in this litigation. In short, the Court did not find his excuses persuasive then, and it does not find them persuasive now. The Court declines his request to defer ruling on the Motions [55, 57] for same reasons it found he had not diligently pursued discovery in its prior Order [53] and because he never sought to compel discovery in this case.

Having addressed this preliminary issue, the Court will address the merits of Pulliam's claims in turn.[3]

[3] At the outset, the Court is cognizant that Defendants argue that Pulliam's claims are barred by judicial estoppel. It is undisputed that Pulliam filed bankruptcy in October 2025 and failed to disclose the existence of this lawsuit in his bankruptcy filing. One day after Defendants filed their respective Motions [55, 57], however, the Supreme Court decided *Keathley v. Buddy Ayers Constr., Inc.*, 146 S. Ct. 1532 (2026) abrogating the Fifth Circuit's traditional approach to judicial estoppel in the bankruptcy context and adopting a totality of the circumstances test. In light of that ruling, one of this Court's colleagues in this district has recently elaborated on the unclarity surrounding this issue. *See Keathley v. Buddy Ayers Constr., Inc.*, 2026 WL 2083912 (N.D. Miss. July 20, 2026). Ultimately, even if judicial estoppel did not bar Pulliam's claims, the outcome herein would remain unchanged. For this reason, the Court need not delve further into this issue and will consider Pulliam's claims on the merits.

### A. Race Discrimination

As noted above, Pulliam brings race discrimination claims under Title VII and Section 1981 against both DenMar and the Union. Because the same legal standards apply to race discrimination claims under Title VII and Section 1981, the Court will analyze them together. *See DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007); *see also Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606 n.1 (5th Cir. 2001).

Title VII of the Civil Rights Act forbids an employer from, among other things, firing an employee on the basis of their race. 42 U.S.C. § 2000-2(a)(1). In support of his claims, Pulliam relies on circumstantial evidence and therefore the familiar *McDonnell Douglas* burden-shifting framework applies. *See Harville v. City of Houston, Mississippi*, 945 F.3d 870, 874 (5th Cir. 2019).

"Under that framework, [Pulliam] must first make a prima facie case of race discrimination, and then the burden of production shifts to [DenMar] to proffer a legitimate, nondiscriminatory reason for [its] action." *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021) (citing *Outley v. Luke & Assoc., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016)). If DenMar does that, "the presumption of discrimination disappears," and Pulliam "must then produce substantial evidence indicating that the proffered legitimate[,] nondiscriminatory reason is pretext for discrimination." *Id.*

The Court first addresses Pulliam's race discrimination claims against DenMar. To establish a prima facie case of racial discrimination under Title VII, a plaintiff must show that "he (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021) (quoting *Stroy v. Gibson on behalf of Dep't of Veterans Affs.*, 896 F.3d 693, 698 (5th Cir. 2018))

(internal quotation marks omitted). DenMar concedes that the first three elements are met; however, it takes issue with the fourth element.

As to the fourth element, DenMar argues that Pulliam cannot establish a prima facie case of race discrimination because he fails to point to a suitable comparator.[4] Pulliam proffers three comparators in support of the fourth element namely, Dawn Byrd, Philesa DeSmidt, and Richard Junkins.

"In the Fifth Circuit, 'an employee who proffers a fellow employee as a comparator must demonstrate that the employment actions at issue were taken under nearly identical circumstances.'" *Wilder v. Stephen F. Austin State Univ.*, 552 F. Supp. 3d 639, 658 (E.D. Tex. 2021) (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)). "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.* There is no dispute that Byrd, DeSmidt, and Junkins are white and also employed by DenMar in similar positions as Pulliam.

As to Junkins, Pulliam argues that he was treated less favorably than him because Junkins had a record of multiple violations and was not disciplined with termination. Pulliam relies on DenMar's discipline log to support his argument.

The discipline log shows that Junkins was disciplined a total of four times over the span of approximately two years. *See* [61], Ex. 5. He incurred three violations for "tool control, safety and FOD control program" and received written warnings for those violations, and one "violation of safety and health program" for which he received counseling as the disciplinary action. *Id.* at p. 1-

[4] It is undisputed that Pulliam was replaced by someone within his protected group.

2. At his deposition, Pulliam described these violations as "major" and testified that, in his view, they warranted termination but Junkins was retained. *Id.*, Ex. 1 at p. 130-31. He further testified that these violations typically arose from failing an Air Force inspection. *Id.* at p. 131. Of note, the discipline log shows that Pulliam was also cited for a "tool control, safety and FOD control program" violation in December 2023, and like Junkins, he was issued a written warning as a result. [61], Ex. 5 at p. 2. In the Court's view, this undercuts Pulliam's argument that Junkins was extended leniency for committing terminable violations. More importantly, the disciplinary action form documenting the violation for which Pulliam was terminated describes the violation as "dishonesty." [55], Ex. 6 at p. 1. During his deposition, Pulliam conceded that he falsified an inventory using Porter's credentials on January 3, 2024 and, when asked about it by DenMar's management during their investigation, he was dishonest. *See* [61], Ex. 1 at p. 96.

In *Lee*, the Fifth Circuit affirmed a district court's finding that the plaintiff's co-worker, who had been fired for dishonesty, had not committed a comparable violation as the plaintiff, who was terminated for moving violations related to operation of a train, and was therefore not a proper comparator. *Lee*, 574 F.3d at 261. Here, as in *Lee*, Junkins' violations, as characterized by Pulliam himself, resulted from failed Air Force inspections, which are naturally different from Pulliam's admitted acts of dishonesty. Unlike Pulliam's misconduct, there is simply no evidence in the record to support that Junkins' violations involved dishonesty. The Court does not find the conduct underlying these violations comparable, and, although Pulliam contends that Junkins' violations were more serious than his violation involving dishonesty, he points to no evidence that DenMar treated them that way.

Additionally, at his deposition, Pulliam testified that Junkins worked in the "engine shop," a different area from the T-38 hangar. [61], Ex. 1 at p. 150. It is undisputed that Miranda Deans

was the M1 employee who supervised tools and parts attendants working in the T-38 hangar, and, according to Pulliam, she also supervised "other various CTKs." *Id.* at p. 65.[5] However, it is unclear whether Deans supervised Junkins. In his Response Memorandum [65], Pulliam does not contend that Junkins and Pulliam shared the same supervisor, and the record is devoid of evidence that confirms that is the case. For this reason, in addition to his incomparable violation history, the Court finds that Junkins is an inappropriate comparator for purposes of a race discrimination analysis.

Regarding the second proffered comparator, Byrd, Pulliam similarly argues that DenMar extended her leniency for more serious violations than his. He testified that Byrd had "received major corps writeups," which, similar to Junkins' violations, he described as failed Air Force inspections. [61], Ex. 1 at p. 131. According to DenMar's discipline log, Byrd received two counseling actions for "unsatisfactory quality of work" in mid-2022. *Id.*, Ex. 5 at p. 1. Though the discipline log describes Byrd's violations differently from Junkins's violations, Pulliam describes them as also resulting from failed Air Force inspections. As with Junkins' violations, Pulliam provides no evidence to indicate that Byrd's violations involved dishonesty or that DenMar treated them as more serious violations than Pulliam's acts of dishonesty. Thus, for the same reasons provided with respect to Junkins, the Court does not find Byrd's and Pulliam's violation histories comparable.

Pulliam also argues that Byrd used credentials other than her own to complete shift-change inventories but was nonetheless retained by DenMar. He raises the same argument with respect to DeSmidt, his third proffered comparator. DenMar does not contest that, after it terminated Pulliam, it discovered that two other employees had used another person's credentials to perform inventory

[5] At his deposition, Pulliam clarified that his reference to "CTK" is either a reference to the specific tool room and/or the personnel running the tool room. *Id.* at p. 103.

of tools and parts but it does not identify who those employees were. Irrespectively, Pulliam's arguments only relate to one aspect of DenMar's reason for his termination.

In her sworn declaration, Marquetta Fritsch, the President and CEO of DenMar, provides the following explanation concerning Pulliam's termination:

> Upon learning of [the] issue, Darren Womack and I immediately initiated an investigation into Pulliam's and Porter's use of each other's credentials.
>
> When asked about whether they used each other's credentials, both Pulliam and Porter lied despite numerous opportunities to change their position and each time they stated they did not. Both Pulliam and Porter were terminated for their dishonesty at the conclusion of the investigation.
>
> . . .
>
> We discovered two other DenMar employees were placed in a position by a third-party on the base in which they felt it was necessary to use others' credentials, which was specifically at management level and at the end of a Swing or Mid Shift. None of these individuals lied to me or Darren Womack when asked about their use of others' credentials.

[55], Ex. 1 at p. 2.

Based on Fritsch's declaration, Pulliam was terminated for acting dishonestly beyond his mere use of Porter's credentials—for his deliberate lie to management when asked whether he had used Porter's credentials. This is where the distinction between Pulliam's conduct and Byrd's and DeSmidt's conduct lies. When asked during his deposition whether he was aware of any DenMar employee who lied to management and remained employed, Pulliam testified that he did not know. [61], Ex. 1 at p. 105. He offers no argument, much less proof, that Byrd and DeSmidt lied to management during DenMar's investigation into credential sharing in the workplace. The Court finds that Byrd's and DeSmidt's alleged use of another person's credentials, which drew no adverse employment decision, is not "nearly identical" to Pulliam's additional dishonest conduct of lying

to DenMar's management during an investigation. *See Lee*, 574 F.3d at 260 (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)) ("If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer,' the employees are not similarly situated[.]"). Pulliam's additional act of dishonesty (lying to management) accounts for the difference in the treatment he received, and therefore he, Byrd, and DeSmidt are not similarly situated employees.

In sum, the Court finds that Pulliam has failed to show a prima facie case of racial discrimination and therefore his race discrimination claims against DenMar are subject to dismissal. Even if he had met his prima facie burden, the Court finds that his claims nonetheless fail at the pretext stage.

Pulliam does not dispute that DenMar has provided a legitimate, nondiscriminatory reason for its termination decision. *See Bowen v. Univ. of Texas Med. Branch*, 2022 WL 868707, at *7 (S.D. Tex. Feb. 14, 2022), report and recommendation adopted, 2022 WL 861506 (S.D. Tex. Mar. 23, 2022) ("[I]t is beyond dispute that an employee's dishonesty during an investigation is a legitimate, [non-discriminatory] reason for termination.") (collecting cases). He then bears the burden of "produc[ing] substantial evidence indicating that the proffered legitimate[,] nondiscriminatory reason is a pretext for discrimination." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* Importantly, "[t]he plaintiff must rebut each nondiscriminatory reason articulated by the employer." *Id.*

Alternatively, under a mixed-motive theory applicable to his Title VII claim, Pulliam may "offer sufficient evidence to create a genuine issue of material fact that the defendant's reason,

while true, is only one of the reasons for its conduct and that another motivating factor was the plaintiff's protected characteristic." *Jones v. Ashley Furniture Indus.*, LLC, 2026 WL 1788798, at *6 (N.D. Miss. June 22, 2026) (quoting *Stelly v. Dep't of Pub. Safety & Corr. La. State*, 149 F.4th 516, 525 (5th Cir. 2025)) (internal quotation marks omitted). To meet his burden under this theory, Pulliam must make, at minimum, "some showing that the protected characteristic was at least partially a motivating factor." *Id.*

As to pretext, Pulliam solely relies on evidence of disparate treatment and proffers the same comparators the Court has already addressed. Again, the Court finds that Junkins, Byrd, and DeSmidt are not suitable comparators for the reasons stated above. Other than pointing to these individuals, Pulliam argues that "DenMar utilized the credential-sharing investigation as a targeted tool to eliminate Black personnel in violation." [65] at p. 20. He appears to argue that DenMar targeted him and Porter, who is also black, because of their race. This argument is easily rejected.

During his deposition, Pulliam conceded that Porter used his credentials to falsify an inventory report and subsequently lied to Womack about having done so. [61], Ex. 1 at p. 105. In other words, she engaged in the exact same conduct as Pulliam and was also fired. In the Court's view, pointing to Porter's termination does not rebut DenMar's reason that it terminated Pulliam because he lied to management during an investigation. To the contrary, Pulliam testified that he was unaware of any DenMar employee who lied to management and was retained, and Porter was no exception.

Pulliam also provides no evidence to support that DenMar's decision to terminate him was part of a plan to cull out black employees. During his deposition, he testified that "upon [his] personal opinion, [he] felt blacks got fired more." *Id.* at p. 148. Yet, he also testified that, prior to his termination, he had no reason to believe that DenMar's management was racist. *Id.* at p. 117.

Without more, Pulliam bases his discrimination claims upon his subjective belief alone, which the Fifth Circuit has consistently held is insufficient to establish pretext. *See Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001). He otherwise fails to point to any evidence "of sufficient nature, extent, and quality to permit a jury to reasonably infer [racial] discrimination." *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022). Because he fails to establish a question of fact as to pretext, Pulliam's race discrimination claims against DenMar are due to be dismissed.

Further, the Court notes that Pulliam raises no argument under a mixed-motive theory in his Response Memorandum [65]. The Court finds that he has waived any Title VII claim based on that theory. *See Criner v. Texas--New Mexico Power Co.*, 470 F. App'x 364 (5th Cir. 2012) (affirming the district court's finding that plaintiff waived her mixed-motive theory in failing to raise any argument in response to summary judgment and only applying the pretext analysis to plaintiff's claims). The Court now turns to Pulliam's race discrimination claims against the Union.

Pulliam brings race discrimination claims against the Union under Title VII and Section 1981. The Fifth Circuit applies a modified test for discrimination claims against unions. *See Wesley v. Gen. Drivers, Warehousemen & Helpers Loc. 745*, 660 F.3d 211, 214 (5th Cir. 2011). To prove his race discrimination claims against the Union, Pulliam must show (1) "that he was subjected to an adverse union action;" (2) "that he was treated less favorably by the union than employees of different races;" and (3) "that this differential treatment arose from purposeful racial discrimination." *Id.*

The Union primarily argues that Pulliam cannot show that its treatment of his grievance following his termination was any different from that of any other union member. In response, Pulliam raises the same arguments (almost verbatim) that he did with respect to his race

discrimination claims against DenMar. *See* [64] at p. 11. The Court need not address Pulliam's claims extensively because he fails to establish at least one of the requisite elements.

The Court notes that Pulliam relies on DenMar's discipline log in support of his claims against the Union but wholly fails to explain how that information relates to *the Union's* treatment of grievances for non-black employees versus those of black employees. To the extent Pulliam suggests that the disciplinary actions taken against the employees listed on the discipline log are representative of the Union's effort as to each employee's case, the Court declines to make that inferential leap. Additionally, as the Union points out, Pulliam testified that he had no personal knowledge regarding the Union's representation of other union members employed by DenMar. [61], Ex. 1 at p. 125. He points to no other evidence in the record that relates to the Union's treatment of union members' grievances or cases and, therefore, fails to establish the second element of his claims. The Court finds that Pulliam's race discrimination claims against the Union are subject to dismissal for this reason alone.

**B. Hybrid § 301/Fair Representation**

Finally, Pulliam brings claims for breach of the CBA against DenMar, and for breach of the duty of fair representation against the Union.[6] "The popular term for such claims is a 'hybrid § 301/fair representation' claim as it combines the two claims." *Pegg v. M1 Support Servs., LP*, 2025 WL 2799097, at *3 (N.D. Miss. Sept. 30, 2025) (quoting *Hinton v. Teamsters Local Union No. 891*, 818 F. Supp. 939, 941 (N.D. Miss. 1993)). "The claim against the employer rests on § 301 of the Labor Management Relations Act, since the employee is alleging a breach of the collective bargaining agreement, while the claim against the union rests on a breach of the duty of

[6] In his Complaint [1], Pulliam incorrectly asserts that his fair representation claim against the Union arises under state law. *See Vaca v. Sipes*, 386 U.S. 171, 177 (1967) ("It is obvious that [plaintiff's] complaint alleged a breach by the Union of a duty grounded in federal statutes, and that federal law therefore governs his cause of action.").

fair representation, which is implied under the National Labor Relations Act." *Id.* (internal quotations and citations omitted).

As such, "[h]ybrid actions are comprised of two elements: (1) an allegation that the employer breached the collective bargaining agreement; and (2) an allegation that the union breached its duty of fair representation." *Id.* at *4. "The Fifth Circuit has held that the indispensable predicate for a § 301 action in this situation is a fair representation claim against the union." *Green v. United Parcel Serv. Inc.*, 2025 WL 359282, at *2 (W.D. La. Jan. 30, 2025) (quoting *Jaubert v. Ohmstede, Ltd.*, 574 F. App'x 498, 501 (5th Cir. 2014) (internal quotation marks omitted). Resultantly, "[i]f a union does not breach its duty, a court need not consider whether the employer breached the CBA." *Id.* The Court will first analyze the second prong of Pulliam's hybrid claim as it will determine whether he may proceed against DenMar for alleged breach of the CBA.

"[A] union maintains considerable discretion in processing grievances, and an employee has no absolute right to have [his] grievance taken to arbitration or to any other level of the grievance process." Pegg, 2025 WL 2799097 at *7 (quoting *Landry v. The Cooper/T. Smith Stevedoring Co., Inc.*, 880 F.2d 846, 852 (5th Cir. 1989)) (internal quotation marks omitted). "A union only breaches its duty of fair representation when its 'conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.'" *Id.* (quoting *Landry*, 880 F.2d at 852).

Pulliam raises two arguments in support of his fair representation claim against the Union. First, he argues that Union Steward, Marcel Tucker, was not knowledgeable about the "dynamics" of his work area and that the Union forced him into his interview with DenMar management without a knowledgeable representative in an arbitrary fashion. Second, Pulliam argues that Tucker acted in bad faith by failing to submit mitigating evidence to management following his interview

prior to the termination decision being made and by failing to pursue his grievance through arbitration.

As to Pulliam's first argument, "[a] union's conduct is arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Horner v. Am. Airlines, Inc.*, 927 F.3d 340, 343 n.1 (5th Cir. 2019) (internal quotation marks and citations omitted). During his deposition, Pulliam testified that he believed Jeff Andrews, the union representative typically working his same shift, was aware of the work activity in his area and could have provided him with better representation than Tucker. [61], Ex. 1 at p. 132-33. Despite his contention that the Union acted arbitrarily in having Tucker represent him instead, Pulliam testified that the reason Andrews did not represent him was because Andrews was off work at the time he was summoned for the interview with DenMar's management. *Id.* at p. 91-92. This concession undercuts his argument, and he fails to articulate how the Union's election for Tucker to represent him given Andrew's absence was behavior "so far outside a wide range of reasonableness as to be irrational." *Horner*, 927 F.3d at 343 n.1.

Regarding Pulliam's second argument, "[b]ad faith requires 'a motive to harm a particular group, and turns on the subjective motivation of the union officials.'" *Id.* at 343 n.2 (quoting *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 602 (5th Cir. 2017)). The Union relies on the sworn declaration of Clyde Jackson, the Union President during Pulliam's employment, to support its argument that it diligently pursued Pulliam's grievance. There, Tucker states that the Union pursued Pulliam's grievance through all three steps of the grievance process and ultimately decided to not pursue mediation based on the advice of its legal counsel. [57], Ex. 25 at p. 1-2. He further explains that the Union's decision was based on its evaluation of the evidence and merits of

Pulliam's grievance. *Id.* at p. 3. In his Response Memorandum [64], Pulliam fails to point to evidence that refutes Tucker's statements. He also fails to direct the Court's attention to any evidence showing a *subjective* motivation to harm black union members on the part of Tucker or any other Union representative. The Court is unaware of any such evidence in the record. Notwithstanding, it is well established that a union's "negligence or error in judgment… is not enough to sustain an unfair representation claim." *Bodin v. Morton Salt, Inc.*, 2023 WL 5761332, at *5 (W.D. La. Sept. 6, 2023) (quoting *Jaubert*, 574 F. App'x at 502) (in turn citing *Landry*, 880 F.2d at 852).

In sum, Pulliam has failed to show that the Union acted arbitrarily, discriminatory, or in bad faith in its representation of him. His fair representation claim against the Union is due to be dismissed, and, consequently, his hybrid claim fails in its entirety, including his claim against DenMar for breach of the CBA. *See Green*, 2025 WL 359282 at *2.[7]

## *IV. Conclusion*[8]

For the foregoing reasons, the Court finds DenMar's Motion for Summary Judgment [55] and the Union's Motion for Summary Judgment [57] should be granted and all claims against them dismissed.

---

[7] The Court does not reach the Union's statute of limitations argument regarding Pulliam's fair representation claim as the claim fails on the merits.

[8] As a final matter, the Court notes that the Complaint [1] asserts a state law claim against DenMar for breach of contract. DenMar argues in favor of dismissal of that claim to the extent Pulliam alleges that an employment contract existed between him and DenMar. *See* [56] at p. 3. In response, Pulliam does not base that claim on a theory that he had a standalone employment contract; rather, he argues that DenMar breached the CBA. *See* [65] at p. 14-15. He then relies on *Bobbit v. The Orchard, Ltd.*, 603 So.2d 356 (Miss. 1992), which is a wrongful discharge case. Pulliam does not assert a wrongful discharge claim in his Complaint [1]. In reality, Pulliam's claim is based on DenMar's alleged breach of the CBA that forms part of his hybrid § 301/fair representation claim, which the Court has dismissed herein. To the extent Pulliam asserts a distinct breach of contract claim, he has not adequately briefed the basis for the same in his Response Memorandum [65]. Accordingly, the Court finds that he has abandoned any such claim. *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 459 (5th Cir. 2022) ("A plaintiff abandons claims when it fails to address the claims or oppose a motion challenging those claims.") (citations omitted).

An order in accordance with this opinion shall issue this day.

THIS, the 24th day of August, 2026.

Glen H. Davidson
SENIOR U.S. DISTRICT JUDGE